WILLIAM THWING *vs.* WASHINGTON INSURANCE COMPANY.

A letter from the master of a ship to the owner, stating that she had been surveyed and condemned on account of the expense of repairs, but not stating the cause of her injuries, was sent by the owner to the underwriters with a letter of abandonment, which they declined to accept. The owner afterwards, within thirty days after receiving the master's letter, and immediately after the master's return, called with the master upon the underwriters, exhibited to them the protest and the survey, and claimed a total loss. The protest stated that the vessel met with strong breezes and a heavy sea, and was with difficulty pumped free of water, and, the leak continuing the same, anchored; and the survey declared that she was incapable of proceeding to sea unless recaulked and recoppered, and that the cost of repairs with incidental charges would exceed her value. *Held*, that the abandonment was sufficient.

Under a policy of insurance on freight from Boston to San Francisco, and thence to port or ports in the East Indies and to a port of discharge in the United States, with liberty to return with a cargo of guano from the Chincha Islands instead of the East Indies, freight earned on the outward voyage is not to be deducted from the valuation in the policy, in computing a constructive total loss of freight on the passage from the Chincha Islands home.

The condemnation and sale of a ship at an intermediate port, in consequence of damages sustained by perils insured against, entitle the owner to abandon and claim for a total loss of the freight, although the cargo has been carried to its destination in another vessel for a price equal to the freight which would have been paid if the original ship had completed her voyage and delivered her cargo and the stipulated freight has been paid by the consignees.

ACTION OF CONTRACT upon a policy of insurance, numbered 11,927, for "five thousand dollars on the Ship Carolus, five thousand dollars on the freight of said ship, on board or not, from Boston to San Francisco, and at and thence to port or ports in East Indies or east of the Cape of Good Hope, with liberty to stop at Honolulu, and at and thence to port of discharge in the United States or Europe," at a premium of five per cent., " to add one fourth per cent. for each port used more than one in the East Indies, and one per cent. for North Sea from October 1st to March 1st." This indorsement was afterwards made on the policy : " Liberty is given for the within voyage to be changed so that the ship may return with a guano cargo from the Chincha Islands instead of the East Indies." The vessel and freight were each valued in the policy at $25,000. Trial before *Merrick*, J., who made the following report thereof :

The vessel delivered her cargo at San Francisco on the out-ward voyage, and made freight to the amount of $23,238.80. On the homeward voyage from the Chincha Islands, she put in a leaky condition into Callao (which she was obliged to visit to obtain a clearance), was surveyed and condemned, and was sold by the master. The cargo was transhipped for the port of delivery for a freight of $17,000 or $18,000, equal to that which the plaintiff was to have received.

After the introduction by the plaintiff of some evidence of the amount and possibility of repairs necessary to make the ship seaworthy, the defendants admitted that the plaintiff was to recover, if anything, for a total loss of the ship.

As evidence of an abandonment the plaintiff offered a letter from himself to the defendants, inclosing one from the master to him, and the defendants' answer, all three of which are copied in the margin; * also the testimony of the master that on his

---

* " Callao, November 10, 1853.

" Mr. William Thwing. Dear Sir, I write to inform you that I am now nearly discharged, shall finish on Saturday next the 12th inst. and will say to you that another survey has been held on the Ship Carolus of Boston, and the report is as follows : that the ship must be hove out, stripped of her copper, and caulked from garboard to decks, and coppered anew and refastened nearly all over; and an estimate of the repairs has been called for and handed in to me, and it amounts to nearly $17,000 in this place to make the ship fit to take a cargo home ; should we find anything more when hove down, it will make an expensive bill of repairs. I have consulted the insurance agent and other experienced shipmasters here, and all are of the opinion that it will be best for all concerned to sell the ship at public auction. Therefore they have condemned the ship, and it will be sold on Wednesday the 16th inst. at public auction, for the benefit of whom it may concern, and I shall close all business here as fast as possible, and hasten to see you in Boston by the earliest opportunity. I have not heard from you since I left San Francisco. I have had a hard time of it in this ship.

" Respectfully yours,     Luther Hurd."

" Boston, December 13, 1853.

" Isaac Sweetser, Esq., President Washington Ins. Co. Dear Sir, By a letter from Captain Hurd of the 10th November last, which I now exhibit, you will see that the Ship Carolus has been condemned, and was to be sold at Callao. I therefore am constrained to abandon said vessel and her freight to your com-

return to the United States, and between the 10th and 12th of January 1854, he went with the plaintiff to the office of the defendants, exhibited to them the protest and survey, and claimed a total loss.

The protest stated that the vessel, at the time of sailing from the Chincha Islands for Callao on the 8th of October 1853, " was tight, stanch and strong, well manned, provisioned and provided with everything necessary for the said voyage, and on the following day at 4 P. M. experienced strong breezes and a heavy sea; at 8 P. M. they started the pumps, and, finding that they did not free the ship, they sounded the well at 8 h. 20 min. and found twenty six inches of water still in her; all hands were then turned to the pumps, and at 10 h. 30 min. they succeeded in freeing her, and afterwards one pump, kept going, kept her so ; that on the 10th the leak continued the same, and at 2 P. M. of the 11th they anchored the vessel in Callao Bay."

The surveyors reported " that the ship is still leaking badly, though in light ballast and at anchor in smooth water ; that she is much strained, and has worked in her whole frame. We are therefore of the opinion that she is incapable of proceeding to sea, unless she be hove down and recaulked and recoppered ; nor do we believe she can receive cargo with safety, unless extensively refastened both below and between decks. We are also of the opinion, taking into consideration the age and general condition of the vessel, that, even with the repairs named, it would be hazardous to load with guano to an extent beyond her register tonnage. And in view of all the above circumstances, and the excessive cost of repairing her, as is shown by

pany, so far as they are covered by policy No. 11,927, and give you notice that I claim payment of a total loss.

" Respectfully, William Thwing."

" Office of Washington Insurance Co. Boston, December 14, 1853
" Wm. Thwing, Esq. . Dear Sir, Your letter of 13th inst., tendering an abandonment of so much of Ship Carolus and her freight as are insured by our policy No. 11,927, is received, but the abandonment is not accepted.

" Yrs very respectfully, Isaac Sweetser."

the carpenter's estimate annexed, amounting to $12,725, we are of the further opinion that the said cost of repairs, together with such other charges of commissions and marine premiums as must accrue thereon, would exceed her value, and that she ought to be condemned and sold."

The presiding judge instructed the jury that on the evidence they could find that a sufficient abandonment had been made ; and that if they found for a total loss of the ship, the plaintiff was entitled to recover for a total loss of the freight, the amount of the valuation. To these rulings the defendants excepted.

The jury found for a total loss, and rendered a verdict for the amount insured on the freight, and for the amount insured on the ship, less the salvage received on the proceeds of the sale. And the parties agreed that, if by reason of any error in the foregoing rulings the amount of the verdict ought to be changed, the case should be sent to an assessor to reform the verdict under instructions from the court.

*F. C. Loring & J. Lathrop*, for the defendants. 1. The loss not being actually total, a sufficient abandonment was necessary to render the defendants liable for a constructive total loss And the abandonment acquires new importance under the recent decisions of this court, making it in effect the proximate cause of the liability of underwriters who have insured against total loss only. *Heebner* v. *Eagle Ins. Co. ante*, 131. *Kettell* v. *Alliance Ins. Co. ante*, 144.

To an abandonment, whether written or oral, two things at least are necessary ; it must be sufficient, if accepted, to transfer the property to the insurers ; and it must state a loss by a peril insured against.

In this case, the plaintiff's letter of abandonment stated only that the vessel had been condemned and was to be sold — which might have been on the libel of a material man in admiralty, or for being engaged in the slave trade, or any breach of the revenue laws, or any one of divers other causes. As the sale of a vessel *per se* gives no right of abandonment, *a fortiori* the condemnation does not, and the mention of the mere fact of condemnation is insufficient, and no statement of the cause of the

loss. The master's letter, inclosed in the plaintiff's, shows that the cause of condemnation was need of repairs; but not that perils of the sea were the cause of her being out of repair. *Bullard* v. *Roger Williams Ins. Co.* 1 Curt C. C. 152. *Peirce* v. *Ocean Ins. Co.* 18 Pick. 93. *Suydam* v. *Marine Ins. Co.* 1 Johns. 181. *Dickey* v. *New York Ins. Co.* 4 Cow. 222. *King* v. *Delaware Ins. Co.* 2 Wash. C. C. 300. The documents handed to the defendants a month after the abandonment cannot be referred to for the purpose of supplying its deficiencies. And neither the protest nor the survey, if referred to, show anything more than a leak and need of repairs; they do not show that the leak was caused by a peril insured against.

The case of *Heebner* v. *Eagle Ins. Co. ante*, 131, is within the exception that if the assured, at the time of abandonment, refers to information which he has received, the abandonment is not invalidated by omitting to mention the peril which caused the loss, because the underwriters can call for this information before deciding whether to accept the abandonment; and this is the only ground upon which that case can be reconciled with the previous decisions. *Peirce* v. *Ocean Ins. Co.* 18 Pick. 93. *Macy* v. *Whaling Ins. Co.* 9 Met. 354.

2. There has been no total loss of freight. The voyage insured, from Boston to San Francisco, and to return from the Chincha Islands with a cargo of guano to the United States, was a round voyage, and the defendants, if liable at all, are only liable for the difference between the valuation and the amount earned on the outward voyage. Emerigon on Insurance, *c.* 17, sect. 9; (Meredith's ed.) 708. *Adams* v. *Pennsylvania Ins. Co.* 1 Rawle, 97. The leading cases in favor of considering voyages as distinct were decided on the ground that the premium was double; which is not the case here. *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 610. *Davy* v. *Hallett*, 3 Caines, 16. Under a charter party, a voyage similar to that described in this policy, for which a gross sum was to be paid as freight, would be an entire voyage. *Towle* v. *Kettell*, 5 Cush. 18, & cases cited.

3. Admitting the voyages to be distinct there has been no

loss of freight on the homeward voyage. If the vessel was not constructively a total loss, it is clear that the freight was not lost. *Jordan* v. *Warren Ins. Co.* 1 Story R. 342. *McGaw* v. *Ocean Ins. Co.* 23 Pick. 405. *Lord* v. *Neptune Ins. Co. ante*, 109.

Even a loss of the vessel at an intermediate port, which is actually total in its nature, or which is rendered total by abandonment, does not necessarily constitute a total loss of the freight. The rights, duties and responsibilities of the different classes of underwriters are distinct in their nature, and are not to be confounded in determining their respective liabilities; and it makes no difference in this respect that the same parties insured both ship and freight. *Benson* v. *Chapman*, 2 H. L. Cas. 696. *Scottish Marine Ins. Co.* v. *Turner*, 4 H. L. Cas. 312, note. *Lord* v. *Neptune Ins. Co. ante*, 121, 122. *Fiedler* v. *New York Ins. Co.* 6 Duer, 282.

That a constructive total loss of the ship does not necessarily involve a total loss of freight is evident from the fact that the ship may nevertheless earn freight. An abandonment of the ship would transfer to the underwriters the right to the freight, just as a sale would transfer pending freight; but neither could create a liability.

In England, a total loss of the vessel at an intermediate port may perhaps be a total loss of the freight, because the master seems not to be obliged to send the goods on. *Shipton* v. *Thornton*, 9 Ad. & El. 338. *Gibbs* v. *Grey*, 2 H. & N. 22. But in the United States, the law is well settled that the loss of the ship at an intermediate port does not draw after it, as a necessary consequence, the loss of the freight; but it is the duty of the master to send the goods on in another vessel. *Schieffelin* v. *New York Ins. Co.* 9 Johns. 21. *Bryant* v. *Commonwealth Ins. Co.* 6 Pick. 131. *Robinson* v. *Commercial Ins. Co.* 3 Sumner, 220. And if the goods are forwarded at an increased freight, their owner is liable therefor. *Searle* v. *Scovell*, 4 Johns. Ch. 218. *Mumford* v. *Commercial Ins. Co.* 5 Johns. 262.

The same principle applies to an underwriter on freight. He is not liable, although the ship be lost at an intermediate port, if the goods can be sent forward so as to arrive *in specie* and

earn freight.   The expense of sending them on in another ship, so far as it is greater than the freight agreed on, is a charge upon the owner of the goods.   If the expense is the same, it is not a charge upon the underwriter on freight; his contract being merely that the goods shall arrive and freight be earned, not that there shall be any profit.  1 Arnould on Ins. § 79.   2 Arnould on Ins. § 397.   *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595.   *Bradhurst* v. *Columbian Ins. Co.* 9 Johns. 17.   *Ogden* v. *General Mutual Ins. Co.* 2 Duer, 215.

If the master is not bound, he has the unquestionable right, to forward the cargo by another vessel and earn the freight.   Or donnance de la Marine, lib. 3, tit. 3, art. 11.   Pothier, Charte Partie, § 68.  2 Boulay Paty, Droit Commercial, tit. 8, § 8.   Abbott on Shipping, (7th ed.) 365.   If the master then sends on the goods, he does it on the original contract, and the owners of the goods are bound to pay the original freight, though this be more than the freight by the substituted ship.   *Shipton* v. *Thornton,* 9 Ad. & El. 338.   *Rosetto* v. *Gurney,* 11 C. B. 176. 3 Kent Com. (6th ed.) 228, 229.

If the vessel is disabled at an intermediate port, the master has a right to require payment of freight *pro rata,* or to forward the cargo and earn freight, if practicable ; and his election to abandon the voyage and surrender his claim for freight should not throw a loss upon the underwriters, for which they would not be liable if he chose to forward the cargo.   Here the master did send on the cargo in another vessel at the same rate of freight, which the plaintiff has received, and has therefore sustained no loss.

It is true that the shipowner pays another vessel the price which he was to receive for carrying in his own vessel; but that does not necessarily involve a loss.   The owner saves the cost of wages and provisions and other expenses of navigating the ship; so that if he were entitled to recover the whole amount of the freight insured, he would receive a much larger profit than he would have received if the voyage had been performed. If there was a profit in the rate of freight over and above that cost, he loses that; but he might lose it equally by an acci-

38 *

dental prolonging of the voyage. If there was no profit on the freight, he loses nothing.

Where a ship is disabled, and the master procures another to take on the goods and earn the freight, the policy on the freight attaches to the freight of the goods on board the new ship, and covers it, so that if that vessel is lost with the goods on board, the underwriter on it is liable. This well settled rule is entirely inconsistent with the idea that a loss of the ship necessarily involves the loss of freight.

The general principle may be stated thus : Insurance on the freight of a ship with a cargo on board attaches to both subjects, ship and cargo ; and the contract of the insurer is that the owner shall not be prevented by the perils of the seas from earning that freight ; but it does not attach exclusively to either subject ; and if either is lost, and yet the freight is earned, the insurer is not liable. If, for instance, the cargo is lost by seizure, capture or other cause, and the master can nevertheless obtain another cargo, accomplish his voyage and earn his freight, the insurer is not liable. Or, if the ship is disabled, and the master may and does procure another to take on the cargo, and so earn his freight, the insurer is not liable.

4. If the plaintiff is entitled to recover for a total loss of freight, he must account for the freight earned and received by him for carrying on and delivering the cargo, as so much salvage ; and the verdict must be reduced in that amount.

5. The validity of an abandonment depends upon the facts existing, and not upon the information received by the assured, at the time of making it. 2 Phil. Ins. § 1657. *Marshall* v. *Delaware Ins. Co.* 4 Cranch, 202. *Church* v. *Bedient*, 1 Caines Cas. 21. *Adams* v. *Delaware Ins. Co.* 3 Binn. 287. The abandonment in this case was made after the cargo had been reshipped and was in course of transportation ; so that there was then no loss of freight.

*R. H. Dana, Jr. & D. Thaxter*, for the plaintiff.

Judgment was entered at March term 1859.

BIGELOW, J. 1. Assuming that, on the facts proved at the trial, an abandonment was necessary to enable the plaintiff to

recover for a constructive total loss, we are of opinion that sufficient facts were shown to establish a valid abandonment.

. If the case stood on the letter of December 13th from the plaintiff to the defendants, communicating to them the letter which he had received from the master, there would have been more reason for maintaining that the abandonment was insufficient, because neither his letter nor that of the master contained any distinct or definite statement from which it could with certainty be inferred that the loss was owing to a peril insured against. A condemnation in a foreign port, after a survey occasioned by the necessity of there making extensive and costly repairs on the vessel, without any intimation as to the cause which rendered them necessary, may, under certain circumstances, be deficient in one of the essential requisites of a valid abandonment. As such condemnation and sale might be expedient and necessary from causes other than that arising from the risks covered by the policy, a mere statement of them as the cause of abandonment, and the foundation of a claim for a total loss, may give no information to the insurer, on which he can act with safety, that the loss in fact arose from one of the perils against which he agreed to indemnify the assured. The validity of such an abandonment, however, depends very much on the circumstances under which it was made, and how it must have been understood by the parties. *Heebner* v. *Eagle Ins. Co. ante*, 136.

But the case of the plaintiff does not rest on these letters. It appears that subsequently, and within thirty days after he received the letter of the master communicating to him intelligence of the loss of the vessel, and immediately after the master's return, he went to the defendants in company with the master, exhibited to them the protest and survey, and then claimed of them a total loss. No particular form is necessary to constitute a valid abandonment, nor need it be in writing. It is sufficient if the assured claims a total loss of the insurers, under circumstances from which an intent to abandon may be fairly inferred. Nor is it requisite that the cause of the loss should be distinctly stated, if the assured, in

making the abandonment, refers to the intelligence in his posses-
sion as the ground of his claim, puts it within the reach of the
underwriter, and the latter omits to inquire unto the circum-
stances or to ask for further information. 2 Phil. Ins. § 1682.
*Patapsco Ins. Co.* v. *Southgate,* 5 Pet. 604. *Macy* v. *Whaling
Ins. Co.* 9 Met. 359. *Heebner* v. *Eagle Ins. Co. ante,* 139. The
defendants could have had no doubt of the intention of the
plaintiff to make an abandonment by his claim for a total loss
in company with the master on the 10th, 11th or 12th of Jan-
uary. This verbal claim, in connection with his previous letter
of December 13th, in which he made an explicit abandon-
ment of both vessel and freight, left no doubt as to his intention,
and it could not have been misunderstood by the defendants.
There was a sufficient disclosure of the cause of the loss. By
the protest it appears that the vessel, in her passage from the
Chincha Islands to Callao, met with strong breezes and a heavy
sea, after which she leaked badly ; that she was tight and
stanch when she set sail ; and that the leaks were not occasioned
by any insufficiency of the vessel. By the survey made at Cal-
lao, it is shown that she was " much strained, and had worked in
her whole frame." These papers were exhibited to the defend-
ants ; and the master was present, who knew the circumstances
and the occasion of the injury to the vessel, from whom the
defendants might have obtained further and fuller informa-
tion, if they had deemed it necessary to ask for it. Nor can
it be contended that this abandonment was not seasonable.
It was made as soon as the plaintiff had received sufficient
intelligence of the cause of the loss to enable him to make it.
On the 13th of December he communicated to the defend-
ants all the information he had by the letter from the mas-
ter of November 10th. As this did not contain any state-
ment of the cause of the loss, the subsequent delay was not
only not unreasonable, but was essential to enable the assured
to make his abandonment complete and sufficient. The jury
having found that the loss was occasioned by perils of the sea,
and it being admitted that the plaintiff is entitled to recover for
a total loss of the ship if a valid abandonment was made, we

are of opinion that he has established a right to recover so much of his claim as is equal to the sum at which the ship was valued in the policy.

2. The only other question in the case is, whether the facts proved at the trial show a valid claim for a total loss of freight to the full amount insured by the policy.   Two questions arise on this part of the case.

The first is, whether, if the defendants are liable at all, a recovery is to be had for the full sum at which the freight is valued in the policy, or only for the difference between the valuation and the amount earned on the outward voyage; in other words, Is the sum which was received by the plaintiff for the carriage of a cargo from Boston to San Francisco to be deducted from the sum at which the freight is valued, in order to ascertain the sum to which the plaintiff is entitled in case of a loss of freight occurring on the homeward voyage?   Upon this point we can entertain no doubt.   The voyages contemplated and covered by the terms of the policy were to ports at a long distance from each other, on each of which the amount of freight pending might be very nearly equal to the valuation, and the aggregate of that which would be at risk during all the successive voyages would far exceed it.   If the policy is to be construed so that the freight earned on the first voyage is to be deducted from the valuation, the freight which would be at risk during the subsequent stages named in the policy would be nearly, if not entirely uninsured.   Such could not have been the intention of the parties in making the contract of insurance.   In the absence of any explicit provision to the contrary, the reasonable inference is, that the parties intended to protect by the policy the subject matter which would be at risk during the successive stages of the voyages specified.   The insurance is not on th aggregate freight of all the voyages, but on the freight pending during each period.   The rule of law applicable to the construction of policies like the one declared on, is well and carefully stated in 2 Phil. Ins. § 1208.   It is in substance this : A valuation of freight in a policy for successive voyages is presumed to be of that successively pending : but this presumption is liable

to be rebutted by circumstances showing that the valuation is applicable to the aggregate amount of the successive freights. No such circumstances exist in the present case. On the contrary, it appears that distinct voyages or adventures, not one round voyage, were contemplated by the parties; that the amount of the outward freight, which must have been ascertained when the policy was issued, nearly exhausted the valuation, so that, on the construction contended for by the defendants, the subsequent voyages would be substantially uninsured; and that the premium seems to have been calculated on the basis of a continuance of the entire risk during the successive voyages, as is shown by the stipulation for additional premiums. Regarding the contract as one of indemnity, it should be construed in such manner as to give protection to the assured for the amount of the subject matter at risk to the extent of the valuation, unless a different intention is unequivocally manifested. For this reason a different rule of interpretation is to be applied to policies from that applicable to charter parties, in determining whether a sum stipulated to be paid for the hire of a vessel is divisible, or due only on the completion of an entire voyage or succession of voyages. *Davy* v. *Hallett*, 3 Caines, 16. *Patapsco Ins. Co.* v. *Biscoe*, 7 Gill & Johns. 293. *Hughes* v. *Union Ins. Co.* 8 Wheat. 294. *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595. 1 Arnould on Ins. § 128. It follows that as the homeward voyage had commenced, and the entire subject of valuation was at risk, when the injury by a peril of the sea happened, which occasioned a total loss of the ship, the assured, if he can recover at all for a loss of freight, is entitled to the full sum at which it is valued in the policy.

3. This brings us to the consideration of the remaining and more interesting question, whether the facts disclosed are such as to give the plaintiff any claim on the defendants for a loss of freight. The ground on which this claim is resisted is, that although there may have been a constructive total loss of the ship, consequent on a justifiable sale, rendered necessary by perils insured against, there has been no loss of freight whatever, because it appears that the cargo with which the ship was laden

was taken out uninjured, and transhipped by the master on board of another vessel, by which it was conveyed in safety to the port of destination, where the agreed price for its carriage was paid by the consignees ; and that it makes no difference in this respect, that the cost of transhipment and carriage by the substituted vessel is equivalent to the sum agreed to be paid to the plaintiff for the transportation of the cargo by the original ship.

But we cannot think this view of the facts is founded on a just appreciation of the contract of insurance on freight, or of the relation which subsisted between the master and the parties interested in the ship, cargo and freight, at the time when the constructive loss of the vessel took place. By a contract of insurance on freight, the underwriters agree to make good to the owner of the ship the sum which would have been earned as a compensation for the carriage of the cargo, but for the intervention of the perils insured against. In other words, it is an agreement that the perils insured against shall not prevent the owner from earning freight on a particular voyage. If a policy is made on the freight of a cargo laden on board of a vessel destined for a designated voyage, the risk attaches to that particular cargo on board of that vessel. It is, in effect, a stipulation that the insurer will indemnify the owner, if the vessel, owing to one of the perils insured against, is prevented from earning the freight on that cargo. It has therefore been said by this court, that after a policy has so attached to that vessel and cargo, as a general rule, with some exceptions, if the vessel is wholly lost by a peril insured against, the power of earning freight is lost, and the insurer is liable on his contract. *Lord v. Neptune Ins. Co. ante,* 113.

In the application of this rule, the effect of a constructive total loss of the vessel is the same as an actual total loss. This is the necessary result of the legal right which the owner has to abandon his vessel and give up the voyage for a sufficient cause. The contract of affreightment and that of insurance on the freight must be presumed to have been made in contemplation of a contingency which might justify such abandonment. As the ship, cargo and freight are each proper subjects of insurance,

the owner of each may well protect his interest by a policy · and the right of each under his policy cannot be in any way affected or impaired by the existence of insurance on the other subjects at risk. *Lord* v. *Neptune Ins. Co. ante,* 121. Therefore the right of the owner, in case of a constructive total loss, to abandon his vessel and thereby to lose the power of earning freight, cannot be restricted or taken away by the existence of policies on the cargo and freight. Indeed, the insurers on the latter must be presumed to have taken, as one of the risks included in their contract, a constructive total loss of the vessel by one of the perils insured against. Therefore a technical total loss of the vessel may involve a loss of the freight; because, by her lawful abandonment to the underwriters and the consequent vesting in them of the title to the vessel and her capacity to earn freight, (if it cannot be otherwise earned,) he has lost the freight which he would have earned by the completion of her destined voyages. Such, as we have before said, with some exceptions, is the general rule, and by it the plaintiff is entitled to recover his full freight in this action, unless the transhipment of the cargo to another vessel and its carriage to the port of discharge for a sum paid to the owners of the substituted vessel, equal to that which would have been paid to the plaintiff, if his vessel had completed the voyage and delivered the cargo, takes the case out of the rule and brings it within a recognized exception to it. No authority in support of such an exception has been cited, nor are we able to find any foundation for it in the principles of law applicable to freight as a subject matter of insurance. On the contrary, it seems to us to be inconsistent with them. The elementary definition of the term " freight," as used in policies, is the earnings derived by a shipowner from the use of his vessel for the carriage of goods. 1 Phil. Ins. § 327. 1 Arnould on Ins. § 89. If a vessel is lost by perils of the sea, and the cargo is sent forward by the master by another ship, at a rate of freight equal to that which the original vessel would have earned if she had successfully prosecuted her voyage, the owner receives nothing as the earnings of his vessel. The compensation paid for the transportation of the cargo by the con

signees of the shipper passes into the hands of the owner of the substituted vessel. The insured in fact loses not only the profits which would have accrued to him from the contract of affreightment, if he had fulfilled it by delivering the cargo in his own vessel, but also the expense incurred by him in preparing his vessel for the cargo, taking it on board and carrying it to the place of transhipment. It cannot be said that under such circumstances freight, in the sense in which it was understood by the parties to the contract of insurance, has been earned by the assured. The guaranty of the insurer amounts to something more than an agreement that the cargo shall be delivered at the port of destination, so that the amount stipulated to be paid for freight shall be due from the shippers. Such an interpretation of the contract would dissociate freight, as a subject of insurance, from the vessel by which it is to be earned, and attach it wholly to the cargo; and the policy would cease to be a contract of indemnity, by which the owner of a vessel would be protected against loss by reason of the failure of his vessel to earn freight in consequence of a peril insured against.

But it is urged on the part of the defendants, that the loss of a ship at an intermediate port does not necessarily draw after it the loss of the freight; because, if the cargo remains, as in the present case, uninjured, so that it can be transhipped and forwarded, it is the duty of the master to send it on. Both branches of this proposition, taken separately, are true. No doubt there are cases where a vessel is disabled by perils of the sea, and is thus lost or abandoned, in which no claim for a total loss of freight, either actual or constructive, can be maintained. If, for example, a part of the prescribed voyage has been accomplished before the happening of the peril which has disabled the ship, and the cargo remains *in specie*, so that it can be sent forward to the port of discharge at a cost less than a moiety of the stipulated freight, no total loss of freight is thereby occasioned In such case, it is in the power of the owner of the ship, through his agent the master, by a proper exertion of due diligence, to receive a large part of the freight which his vessel had earned prior to her loss. This opportunity he cannot disregard or throw

away. The perils insured against have not deprived him of his freight, or of the capacity of earning it. It is the neglect and omission of his agent, the master, which prevents him from receiving from the shippers the larger part of the stipulated freight as the earnings of his vessel. But it does not follow that, in all cases where the cargo remains in a condition to be reshipped and carried to the end of the voyage, it is the duty of the master, as agent for the owner of the ship, to reship and forward it, or that, if such reshipment is made and the cargo is forwarded and delivered to the consignees, the stipulated freight is thereby earned, so that no claim for a total loss of freight can in such case be sustained. If at the intermediate port the cost of forwarding the cargo in a substituted vessel is as great as or larger than the freight stipulated to be paid by the shipper, the owner of the original vessel can earn no freight, in the sense in which this term is used in a policy on the freight of his vessel, by forwarding the cargo. Nothing can accrue to him, or to the underwriters on freight, by the transhipment and carriage of the cargo. The expense of forwarding the cargo, which is a consequence of a peril insured against, absorbs all that is received for its transportation, and there is no excess of the freight stipulated to be paid for the hire of the original vessel, over the cost of sending forward the cargo, which can come either to the owner of the vessel or the underwriter on freight.

The mistake occurs in supposing that the master is obliged, in his capacity as agent for the owner of the vessel, in all cases of disaster to the vessel, to send forward the cargo, if it remains in a condition to render its transhipment judicious and expedient. But how is any such duty or burden imposed on the owner of the vessel? Certainly not by virtue of the contract of affreightment. That involves no undertaking that the cargo shall be forwarded to its place of destination at all events and under all circumstances. On the contrary, it is always subject to the proviso that its performance may be defeated and excused by perils of the sea. Nor can it be said that the contract of insurance on freight imposes on the assured any obligation to forward the cargo after the loss of the ship, when no part of the

stipulated freight, which was the subject of insurance, can be thereby saved, but the expense of forwarding will equal or exceed the sum to be paid by the shippers. In such case the goods or the cargo by being sent forward can indeed earn freight, but not the freight covered by the policy. The lost vessel can earn no freight, nor by sending forward the cargo can anything be saved as her earnings of that part of the voyage which she has performed. There can be, in such a case, no salvage of freight. We by no means intend to say that it may not be the duty of the master to forward the cargo, after the loss of the vessel, when it can be done for the same or even a greater freight than was to be paid, under the charter party or bill of lading, for carriage by the original vessel. But such an act by the master, although judicious and expedient, would not deprive the owner of his claim for a total loss of freight. If it did, the law would operate with great inequality and injustice. An owner, in case of the loss of his vessel at an intermediate port, where the master was unable to find another vessel to carry on the cargo, would recover the whole sum insured on his freight. What good reason can be given for depriving an owner of his indemnity under his policy for loss of freight, merely because the master preserves the goods, and causes them to be sent forward to the port of destination, at a cost which absorbs the whole sum which was to be paid for the freight of the original ship, leaving nothing to be received under the original contract of affreightment? The actual loss to the owner of the ship is the same in both cases. He receives no benefit by the transhipment of the cargo. The only difference is, that the master in the latter case is enabled to do an act which may enure to the benefit of the owner of the cargo. But certainly this is no reason for taking away the owner's right to an indemnity under his policy on the freight of his vessel.

The cases cited by the learned counsel for the defendants do not go to the extent of maintaining the position on which they rely. Some of the decisions of the courts in this country contain *dicta* in which the duty of the master to tranship is stated without any qualification whatever; but it is in none of them

determined that this is a duty which in every case devolves on him as the agent of the master or of the insurer on freight. It may be difficult to define with accuracy the extent of the master's authority to act for the various parties interested in a voyage, or to fix, definitely, the point at which his agency for one party ceases and for another begins. But we think it may be safely said that whenever and as soon as the owner of a vessel, by reason of the perils of the sea, ceases to have any interest either in the ship or freight, so that nothing of either can be saved or protected by any act of the master, his authority to bind the owner is at an end. The subject matter of the master's agency for the owner of the ship has in such case ceased to exist, and his power to bind his principal ceases with it. The owner himself, if present at an intermediate port under such circumstances, would have no motive or interest in the further prosecution of the voyage. Hence it is that although, in the ordinary state of things, the master is a stranger to the cargo beyond the purposes of safe custody and carriage, yet in cases of necessity, unforeseen and unprovided for, the character of agent for the owner of the cargo may be forced upon him, not by the immediate act of the owner, but by the policy of the law ; otherwise valuable property in his possession and control might be left without any means of care or protection. It may be that the owner of the vessel may adopt and ratify a transhipment made by the master, where the voyage is completed and the cargo carried in a substituted vessel for the original freight, leaving nothing as earnings of the lost vessel. The owner of the cargo could in such case make no complaint or objection, because the contract of affreightment would be fully complied with. But such an act of the master, as binding the owner of the ship, would derive its efficacy, not from his original authority, but from the subsequent ratification. In the absence of any adoption or recognition by the owner of such transhipment, we know of no principle or authority on which it can be held absolutely binding on him. On the contrary, the more reasonable doctrine is that stated in 2 Phil. Ins. § 1634 : " If the motives of the master's course are wholly on the side of one party, then he

must be presumed to have acted on behalf of such party." See *The Gratitudine*, 3 Rob. Adm. 240; *Shipton* v. *Thornton*, 9 Ad. & El. 333; *Gibbs* v. *Grey*, 2 H. & N. 22; Emerigon on Insurance, *c.* 12, sect. 16, § 6, (Meredith's ed ) 343.

Upon the direct question whether, on the facts proved at the trial, the defendants are liable for a total loss of freight, the authorities are quite decisive. In *Whitney* v. *New York Firemen Ins. Co.* 18 Johns. 210, the court say, " To sustain such an action on a policy for freight, the plaintiff must prove that the ship was disabled by the perils insured against, and that the cargo could not have been carried forward from the port of necessity to the port of destination for one half the freight valued in the policy." The same doctrine is fully recognized in *American Ins. Co.* v. *Curtis,* 4 Wend. 53, in which the chancellor states the rule thus : " If no freight *pro rata itineris* has been earned, or the expense of sending on the cargo by another vessel is equal to or exceeds the whole amount of freight agreed upon by the charter party, there is an absolute total loss of freight. If the expense of sending on the cargo by another vessel will exceed a moiety of the freight, it is a technical total loss of the freight, which will authorize the assured to abandon." These decisions, it is to be observed, were made subsequently to the decisions of the cases in the courts of the same state, cited by the counsel for the defendants, in which the duty of the master to tranship and forward the cargo had been stated in the broadest and most comprehensive terms.

In our own court the decision in *Coolidge* v. *Gloucester Marine Ins. Co.* 15 Mass. 341, seems directly in point. That was a case of a constructive total loss of the vessel, which was abandoned to the insurers. She was afterwards repaired, and took on board the same cargo with which she had been laden at the time of the loss, and carried it to the port of destination for " the same amount which would have been earned, if the ship had not met with any disaster." The court say that the vessel, when repaired, must be regarded as a new vessel, and if the master could have procured a new vessel to carry the goods to the port of delivery, " no one would have doubted but that the owners

39*

of the new vessel would have been entitled to the earnings;" and it was held that there was a total loss of freight. See also 2 Phil. on Ins. §§ 1444, 1632.

It was suggested by the learned counsel for the defendants, that the expense of forwarding the cargo by the substituted vessel was only an additional cost or charge which would destroy or take away the profits which otherwise might have been earned under the charter party, and that as the policy did not cover a loss of profits or include a guaranty that the cost of transporting the cargo to the port of destination should not exceed or equal the stipulated freight, there could be no claim for a total loss of freight in this case, inasmuch as the agreed price was paid by the consignees of the cargo. The fallacy of this argument has been already adverted to. It proceeds on the ground that the guaranty of the insured is, that the goods shall earn freight; whereas the real contract is, that the vessel shall earn freight by carrying the goods notwithstanding the perils of the sea. The interest in the freight is connected with the ownership of the vessel, and the insurance upon it is on an accessory to such ownership. It is not an insurance that the cargo will earn freight, as disconnected from the vessel. Besides, we do not see why this argument of the counsel against the right to recover in this case for a total loss would not be equally strong against the right to claim a partial loss, when a large part of the freight had been earned by the original vessel, and the expense of forwarding the cargo had been paid by the owner of the ship. It might be said in such case that the whole freight had been earned and received by the owner of the ship, and that the additional cost of transhipment was only an expense which diminished the profits that might have otherwise accrued, and was not a proper subject for a claim of loss under the policy. But it cannot be doubted that the additional freight paid for the carriage of the goods by the substituted ship would be a partial loss for which the insurer on freight would be liable.

Without going more at large into arguments and illustrations bearing on the question, we are of opinion, on the authorities

and principles above set forth, that the plaintiff has established a claim for a total loss of freight, and that judgment must be entered accordingly.

*Judgment on the verdict for the plaintiff.*